S01A0840, S01X0842. HEAD v. FERRELL; and vice versa.
(554 SE2d 155)

CARLEY, Justice.

In 1988, Eric Lynn Ferrell was found guilty of murdering his 72-year-old grandmother and his 15-year-old cousin and was sentenced to death for each of those murders. He was also found guilty of armed robbery and possession of a firearm by a convicted felon. This Court unanimously affirmed his convictions and sentences in 1991. *Ferrell*

---

*v. State*, 261 Ga. 115 (401 SE2d 741) (1991). Ferrell filed a petition for writ of habeas corpus on July 19, 1995, and an evidentiary hearing was held on July 13, 1999. The habeas court vacated Ferrell's convictions and sentences in an order filed on February 8, 2001. The warden appeals in Case No. S01A0840, and Ferrell cross-appeals in Case No. S01X0842.

## I. Factual Background

Ferrell spent the night of December 29, 1987, at the home of his grandmother, Willie Myrt Lowe. Ferrell's cousin, Tony Kilgore, was also staying with Ms. Lowe that night. The next morning, Ferrell returned to his parents' home. He then obtained a ride with a friend to meet with his probation officer so that he could pay a past-due probation fee. Ferrell told the friend that he would be able to pay for the gasoline for the trip because he had recently received $900 in compensation from Rockdale County for wrongful detention and because he had a zippered pouch full of rolled coins. Ferrell paid his past-due probation fee, bought a six-pack of beer for his friend and himself, and then called home. A neighbor answered his home phone and informed Ferrell that his grandmother was "kinda sick." Ferrell, however, told his friend that he had been informed that someone had hurt his grandmother. Ferrell speculated to the friend that the mafia might have hurt his grandmother in retaliation for a killing recently committed by his uncle.

Ferrell arrived at the scene of the crime, where the bodies of his grandmother and cousin had been discovered. Each had been killed by two small caliber gunshots to the head, and a large store of cash and rolled coins, which Ms. Lowe generally kept in her home, were found to be missing. Ferrell caused a disturbance, demanding to see or be told what had happened to his grandmother, but he was prevented from entering the crime scene. He and other relatives gave witness statements at the police station. Ferrell claimed that he had left his grandmother's house that morning, but he noted nothing unusual other than two hang-up telephone calls and some noises the night before and the presence of a blue car in front of the house as he left in the morning. When Ferrell was questioned again later that day, detectives learned that he was on probation for forgery and that he had been arrested for an unrelated murder. For safety reasons, the detectives asked Ferrell what he had in his pockets, and Ferrell produced a large wad of money totaling over $500, which the detectives returned to him. Ferrell gave the detectives an explanation of how he had received the money that was belied by the detectives' later investigation.

A search of Ferrell's bedroom disclosed a .22 caliber handgun

that was shown at trial to be the murder weapon and all but four unspent shells from two boxes of fifty .22 caliber shells that were shown at trial to match the four bullets recovered from the victims' bodies. In a search incident to his arrest, four .22 caliber shell casings, which matched the ammunition found in his bedroom and which bore markings consistent with their having been fired by the murder weapon, were discovered in Ferrell's back pocket.

Ferrell asked to speak with detectives after his arrest and the discovery of the spent .22 caliber shells in his pocket. At that time and in his later guilt/innocence phase testimony, Ferrell gave the following account of the murders. Two unknown men confronted Ferrell, as he was leaving his grandmother's house, and demanded to see his uncle, who had killed a man six days earlier. When the men pushed their way into the house, Ferrell pulled out his .22 caliber handgun. The men forced him to drop his handgun by pulling out their own .38 caliber handgun and sawed-off shotgun. The two men searched the house, murdered Ferrell's grandmother and cousin with Ferrell's .22 caliber handgun, threw the still-loaded weapon on the bed next to the victims, put a large sum of money in Ferrell's pocket, told him to bring his uncle to them, and left the house. The jury rejected this account of the crimes by its verdicts.

## II. Claims Barred as Res Judicata

The habeas court correctly declined to address the merits of claims previously rejected by this Court in Ferrell's direct appeal. "[A]ny issue raised and ruled upon in the petitioner's direct appeal may not be reasserted in habeas corpus proceedings. . . ." *Gaither v. Gibby*, 267 Ga. 96, 97 (2) (475 SE2d 603) (1996). Therefore, with the exceptions set forth below, this Court will not again address the merits of the following claims to the extent that they were raised in Ferrell's direct appeal: alleged ineffective assistance of trial counsel; alleged conflict of interest of trial counsel; and allegedly improper argument regarding victim impact and victim worth.

## III. Claims Barred by Procedural Default

Claims, other than those regarding sentencing phase jury instructions in death penalty trials, that are raised for the first time in habeas corpus proceedings that could have been raised at trial or on direct appeal are barred by procedural default unless the petitioner can meet the "cause and prejudice" test. *Turpin v. Todd*, 268 Ga. 820, 824 (2) (a) (493 SE2d 900) (1997); *Black v. Hardin*, 255 Ga. 239, 240 (4) (336 SE2d 754) (1985); OCGA § 9-14-48 (d). Compare *Stynchcombe v. Floyd*, 252 Ga. 113, 114-115 (311 SE2d 828) (1984) (addressing sentencing phase jury instructions in death penalty

cases). The only circumstance where the "cause and prejudice" test is not applied is where granting habeas corpus relief is necessary to avoid a "miscarriage of justice," and an extremely high standard applies in such cases. See *Valenzuela v. Newsome*, 253 Ga. 793, 796 (4) (325 SE2d 370) (1985). To show "cause" under the "cause and prejudice" test, a petitioner ordinarily must show that some factor external to the defense impeded counsel's efforts to raise the claim at trial or on direct appeal. *Turpin v. Mobley*, 269 Ga. 635, 637 (2) (502 SE2d 458) (1998). However, this Court has held that ineffective assistance of counsel in waiving an issue at trial or omitting an issue on appeal can also satisfy the "cause" requirement of the "cause and prejudice" test. *Turpin v. Todd*, supra at 826 (2) (a). This Court has further held that a petitioner who has shown sufficient "prejudice" under *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), to support a claim of ineffective assistance of counsel in waiving a claim at trial or omitting a claim on appeal has also shown sufficient "prejudice" under the "cause and prejudice" test applied to procedurally defaulted claims. *Turpin v. Todd*, supra at 829 (2) (b).

The following claims in Ferrell's cross-appeal are barred by procedural default: allegedly improper denial of funds for investigatory assistance in preparing the motion for new trial; alleged error by the trial court in requiring the defense to file a brief on the motion for new trial two weeks prior to the hearing on that motion; alleged violation of *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986); alleged error by the trial court in locking the doors to the courtroom during portions of the trial; alleged error by the trial court in allowing the testimony of Tony Hinton; alleged defects and racial bias in the trial transcript; alleged error in the trial court's charge on reasonable doubt during the guilt/innocence phase; alleged trial court error in allowing evidence of Ferrell's allegedly involuntary guilty pleas to four counts of forgery; alleged racial discrimination in the prosecutor's decision to seek the death penalty (alleged racial bias in the prosecutor's decision to seek the death penalty as part of an alleged pattern and practice of discrimination inherent in Georgia's application of its death penalty laws *was* raised on direct appeal, but was rejected by this Court); alleged constructive absence of Ferrell from his trial proceedings after a shaking and crying episode; alleged invalidity of the indictment based on grand jury selection procedures; alleged unconstitutionality of the Unified Appeal Procedure; and various other claims. Applying the law set forth above, we conclude that Ferrell has failed to show sufficient reason to set aside the bar to any of these claims.

## IV. Sentencing Phase Jury Charges

Claims regarding sentencing phase jury charges in a death penalty case are never barred by procedural default. See *Tucker v. Kemp*, 256 Ga. 571, 573-574 (351 SE2d 196) (1987); *Stynchcombe v. Floyd*, supra at 114-115.

(A) "The use of the phrase 'moral and reasonable certainty' in a charge which, on the whole, repeatedly and accurately conveys the concept of reasonable doubt does not constitute reversible error." *Wayne v. State*, 269 Ga. 36, 40 (7) (495 SE2d 34) (1998). See also *Baldwin v. State*, 264 Ga. 664, 664-666 (1) (449 SE2d 853) (1994). We hold that the sentencing phase charge on reasonable doubt in Ferrell's case was, when read as a whole, not constitutionally deficient. Accordingly, Ferrell's argument that harm must be presumed fails. *Baldwin v. State*, supra at 665 (1).

(B) The trial court's instructions regarding the sentencing phase verdict form, particularly when those instructions are considered in the context of the other sentencing phase jury instructions, would not have misled the jury regarding the standard of proof applicable to a finding of one or more statutory aggravating circumstances or regarding the jury's duty to find no statutory aggravating circumstances to exist and to impose a sentence of imprisonment for life if it did not conclude that the State had carried that burden of proof. See *Butts v. State*, 273 Ga. 760, 770 (26) (546 SE2d 472) (2001) (evaluating individual charge in light of charges as a whole). See also *Palmer v. State*, 271 Ga. 234, 238 (6) (517 SE2d 502) (1999).

Thus, we conclude that Ferrell's allegations of error with regard to sentencing phase instructions are without merit.

## V. Alleged Ineffective Assistance of Appellate Counsel

The habeas court correctly found that the issue of the alleged ineffective assistance of Ferrell's appellate attorney was not subject to any procedural bars, because that claim could not have been raised in Ferrell's motion for new trial or on direct appeal. Compare *White v. Kelso*, 261 Ga. 32 (401 SE2d 733) (1991). Appellate counsel argued in the motion for new trial and on direct appeal that Ferrell's *trial* attorneys had rendered ineffective assistance, but, as noted above, that claim is now barred as res judicata, at least as an independent claim. We consider here only whether *appellate* counsel rendered ineffective assistance.

To prevail on his claim, Ferrell must show that his appellate lawyer rendered deficient performance and that actual prejudice resulted. *Strickland v. Washington*, supra at 687 (III); *Battles v. Chapman*, 269 Ga. 702 (506 SE2d 838) (1998); *Smith v. Francis*, 253 Ga.

782, 783-784 (1) (325 SE2d 362) (1985). With respect to the performance prong, counsel on appeal is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, supra at 690. Because counsel's performance is considered in light of the circumstances surrounding the representation, reference to hindsight is inappropriate in judging counsel's performance. *Strickland v. Washington*, supra at 689-690. Appellate counsel does not render deficient performance by selecting stronger claims for presentation on direct appeal while setting aside weaker ones. *Battles v. Chapman*, supra at 703 (1) (a). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U. S. 527, 536 (106 SC 2661, 91 LE2d 434) (1986). See also *Jones v. Barnes*, 463 U. S. 745, 751-752 (103 SC 3308, 77 LE2d 987) (1983). In order to find actual prejudice, a court must conclude that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different [cit.]." *Smith v. Francis*, supra at 783 (1). An ineffective assistance claim presents a mixed question of fact and law, and we accept the habeas court's findings of fact unless clearly erroneous but independently apply those facts to the law. *Strickland v. Washington*, supra at 698; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

(A) The habeas court concluded that Ferrell's appellate attorney did not effectively present the claim of trial counsel's alleged ineffective assistance in the sentencing phase of Ferrell's trial.

We note, as an initial matter, this Court's own impression during the direct appeal that appellate counsel had "attack[ed] virtually every decision made by trial counsel." *Ferrell v. State*, supra at 119 (3). Ferrell's appellate lawyer testified in the habeas proceeding that she obtained Ferrell's file from his trial attorneys, interviewed Ferrell, spoke to his family members, reviewed some of his school records, and subpoenaed various other records. She also had an independent mental health expert interview Ferrell, review the findings of the mental health expert employed by trial counsel, and review Ferrell's post-conviction mental health records. At the motion for new trial evidentiary hearing, appellate counsel attempted to show that Ferrell's trial attorneys had not prepared sufficiently for the sentencing phase. Toward that end, appellate counsel presented a number of witnesses, including some of Ferrell's family members, the mother of his children, and his trial counsel. Appellate counsel testified at the habeas hearing that Ferrell's family members were "traumatized" at the time of the motion for new trial. This testimony is confirmed by

the testimony of Ferrell's trial attorneys at the motion for new trial hearing indicating that several of Ferrell's own family members believed that he had murdered his grandmother and cousin. Trial counsel further testified that they had been in contact with Ferrell's parents from the beginning of their representation, had obtained a list of 40 to 45 possible witnesses, had used the services of an investigator to assist them in interviewing these witnesses, had obtained school and prison records, had obtained a review of Ferrell by a mental health expert regarding his possible mental retardation and his susceptibility to coercion or confusion during police questioning, and had consulted with several persons who were well versed in death penalty trial strategies in formulating their "residual doubt" strategy for the sentencing phase of Ferrell's trial. As this brief overview indicates, Ferrell's appellate attorney attempted to show the limits of trial counsel's preparation for the sentencing phase, but the evidence actually available, most importantly the evidence of trial counsel's strategic decisions and attempts to develop a theory supportable by available testimony and evidence, was not particularly favorable to Ferrell's claim that his trial attorneys rendered ineffective assistance. Nevertheless, appellate counsel attempted to argue that claim on direct appeal to the extent possible.

The habeas court, as part of its findings regarding alleged ineffective assistance of counsel on appeal, found that Ferrell's trial attorneys "improperly presented character evidence rather than mitigating evidence during the penalty phase of the trial." Although character witnesses sometimes might not contribute significantly to a sentencing phase defense, testimony from Ferrell's closest family members about their perception of his character and his inability to murder his grandmother and cousin fit well into trial counsel's chosen sentencing phase strategy of showing "residual doubt." Mitigating evidence is *anything* that might persuade a jury to impose a sentence less than death, and Ferrell's trial attorneys, as this Court implicitly found on direct appeal, acted with reasonable professional judgment in focusing largely on the mitigation theory of "residual doubt" and presenting testimony consistent with that theory. To the extent that the habeas court held that character witnesses cannot offer mitigating testimony, it was in error.

The habeas court held that appellate counsel rendered ineffective assistance in obtaining and presenting testimony about Ferrell's background at his motion for new trial hearing as part of her argument that trial counsel rendered ineffective assistance in preparing and presenting Ferrell's sentencing phase case. However, our own review of the trial record, the motion for new trial record, and the habeas record fails to reveal adequate support for the habeas court's conclusion. The following comparisons between the evidence and

argument presented by Ferrell in his habeas proceeding and the evidence and argument presented by his appellate lawyer illustrates the basis for our conclusion that she did not render ineffective assistance: Ferrell provided the habeas court with affidavits by a number of family members, friends, and others suggesting that his father had a gambling problem and was responsible for the family's poverty and frequent evictions. However, Ferrell's brother testified along similar lines at the motion for new trial hearing, although he concluded at that time that the family's troubles drew the siblings closer together and closer to their mother. Other affidavit testimony presented to the habeas court showed that Ferrell's family home had burned down when he was approximately five years old. However, appellate counsel also elicited testimony about the fire in the motion for new trial hearing. Furthermore, additional affidavit testimony presented by Ferrell in the habeas proceeding showed that his grandmother took him in after the tragic fire, a fact that certainly would not have served as compelling mitigation evidence in his sentencing for murdering her. Ferrell showed at the habeas proceeding through medical records and affidavit testimony that his mother had suffered from depression and other mental health concerns but, on motion for new trial, appellate counsel also elicited testimony about Ms. Ferrell's nervous condition, her need for medication, and her possible suicide attempt. Furthermore, the fact that Ferrell murdered his mother's mother made this arguably mitigating evidence also aggravating in that Ferrell had clearly exacerbated his mother's difficulties by murdering her mother and nephew. Other affidavit testimony presented at the habeas hearing suggested that shortly before the murders Ferrell made a religious commitment, resolved to turn his life around, and hoped to become a minister. However, similar testimony was presented both at trial and in the motion for new trial hearing. Ferrell presented affidavit testimony at the habeas proceeding by his father and others suggesting that his father disciplined his children, particularly Ferrell, by "whipping" them with switches and a belt. Even in the habeas testimony, however, Ferrell's father added, "I tried to be a good father to those boys. . . ." Even assuming that the worst affidavit testimony about Ferrell's father's discipline was accurate, this testimony would not have made a significant impact on the jury and, more directly to the point, would not have proved unreasonable trial counsel's strategy of focusing on residual doubt rather than appearing to vilify the victims' family members and shift blame. Ferrell presented affidavit testimony in the habeas proceeding from a number of persons who characterized him as polite, mannerly, well-behaved, a good kid, a nice guy, polite to adults, clingy, etc. Much of this affidavit testimony suggests that the characterizations pertained to Ferrell as a young boy. Even assuming that trial and appel-

late counsel could have obtained this testimony, it does not appear that the impact thereof would have been compelling either to the jury at trial or to this Court on direct appeal as part of an ineffective assistance of trial counsel claim, particularly because Ferrell was 24 years old when he committed the crimes. In fact, it appears from the files of Ferrell's trial attorneys and from the motion for new trial hearing that one of the habeas proceeding affiants, Ferrell's fifth grade teacher, had refused to respond to questions posed to her by trial counsel's investigative assistant and that another, Ferrell's uncle, believed at the time of Ferrell's trial and direct appeal that he was guilty of the murders. Furthermore, the motion for new trial testimony showed that Ferrell's defense team had contacted staff members at his high school, but that none of them had anything good to say about him. These facts indicate that neither trial nor appellate counsel rendered ineffective assistance. Several of Ferrell's habeas proceeding affiants also emphasized how much Ferrell relied upon and loved his grandmother, but that testimony must be viewed in light of the fact that she was one of his murder victims, which could quite easily have made that testimony aggravating rather than mitigating.

Ferrell submitted to the habeas court the affidavit testimony of three mental health professionals suggesting that Ferrell suffers from organic brain damage, mental illness, an epileptic or seizure disorder, and mental retardation. However, this testimony, even if taken at face value, fails to demonstrate that Ferrell's appellate lawyer rendered ineffective assistance, because she performed as a reasonable attorney would have by obtaining a mental health expert to meet with Ferrell, to review the findings of the mental health expert employed by trial counsel, and to examine the mental health records created during Ferrell's incarceration. The expert employed by counsel on appeal found Ferrell to be competent, sane, and faking amnesia, and informed her that he could not be helpful. Testimony by trial counsel at the motion for new trial hearing showed that they saw no indications in interacting with Ferrell that suggested mental illness. Appellate counsel, like Ferrell's trial attorneys, performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert and then foregoing arguments not supportable by the opinions of those experts.

This Court concludes, upon reviewing all of the evidence, that Ferrell has failed to show that his appellate lawyer rendered ineffective assistance in preparing and presenting the claim of trial counsel's alleged ineffectiveness in the sentencing phase of his trial.

(B) The habeas court concluded that Ferrell's appellate counsel rendered ineffective assistance in how she handled the argument

that his trial attorneys labored under a conflict of interest. This Court concluded on direct appeal that there was no actual conflict of interest, and nothing presented in Ferrell's habeas proceeding would have in reasonable probability changed that conclusion.

Ferrell argued on direct appeal and argues again in this habeas proceeding that his trial counsel labored under a conflict of interest because both of them were members of the same public defenders' office that was representing Ferrell's uncles in a murder case and because one of Ferrell's attorneys had represented the uncles at a preliminary hearing and the other had filed discovery motions in the uncles' case several months before trial counsel began to represent Ferrell. Ferrell's trial attorneys represented to the trial court, after conducting a review of Ferrell's case and of the possibility of a conflict, that they did not perceive a conflict of interest to exist unless the State intended to call the uncles as witnesses.

One of the uncles testified briefly at Ferrell's motion for new trial hearing, but, according to appellate counsel's testimony, the other uncle had been "hostile" when she attempted to speak with him. Ferrell's appellate lawyer ably set forth the essential contours of the alleged conflict and supported her claim with documentary evidence showing the nature and timing of the final adjudication in the uncles' cases. The only arguably significant argument raised by Ferrell in the habeas proceeding that was not raised by appellate counsel regards a new statement, by the uncle who testified at the motion for new trial hearing, that he had not wanted to get involved in Ferrell's case while his own case was still pending. The habeas court construed this statement as suggesting that the uncles were to receive special treatment from the State in exchange for their cooperation in Ferrell's prosecution. However, this testimony must be viewed in light of the extensive testimony presented at the motion for new trial hearing indicating that the uncles refused to testify for Ferrell, not because of any agreement with the State, but because they believed "adamantly" that Ferrell had murdered their mother. In fact, one of the uncles reported to trial counsel that Ferrell sat and talked with him in jail, but had never once mentioned anything about two gunmen killing Ferrell's grandmother and cousin and declaring their intention to exact retribution against one of the uncles. In light of the clear testimony by Ferrell's trial attorneys on the subject of the uncles' motivation for not wanting to testify at Ferrell's trial and in light of the risk in questioning the uncle who did testify at the motion for new trial hearing on that subject, appellate counsel cannot be regarded as having performed deficiently for failing to explore further the testimony of that one uncle at the motion for new trial hearing. Based upon the foregoing discussion and our review of all the evidence and argument, we conclude that Ferrell's appellate lawyer

did not render deficient performance in preparing and presenting the conflict of interest claim.

(C) Ferrell contends in his cross-appeal that the habeas court erred by failing to conclude that appellate counsel rendered ineffective assistance in a number of ways. We conclude, as is reflected in the abbreviated analysis below, that Ferrell has failed to demonstrate that his appellate attorney rendered ineffective assistance in selecting, preparing, and presenting claims at the motion for new trial and on direct appeal.

(1) Appellate counsel argued on direct appeal that Ferrell's trial attorneys rendered ineffective assistance with regard to his decision to testify at a pre-trial hearing and at trial, with regard to preparing him once the decision to testify had been made, and in the manner in which they actually questioned him on the witness stand. This Court rejected the claims of counsel on appeal, undoubtedly because this Court found credible and reasonable trial counsel's testimony at the motion for new trial hearing that their decision to advise Ferrell to testify was strategic. We conclude that appellate counsel did not render ineffective assistance with regard to this claim.

(2) Ferrell contends that his appellate lawyer rendered ineffective assistance by failing to present additional evidence supportive of Ferrell's retaliation theory, including evidence about Willie Myrt Lowe's having received a number of hang-up phone calls prior to her and her grandson's murders. We conclude that presentation on direct appeal of the same testimony and argument on this issue that Ferrell has presented in the habeas proceeding would not in reasonable probability have changed the result on direct appeal. We also conclude, in light of the weakness of this claim, that appellate counsel did not render deficient performance by focusing on other claims to the exclusion of this one.

(3) Ferrell's appellate attorney argued on direct appeal that trial counsel's avowed strategy in not raising a *Batson* challenge at trial was unreasonable. See *Batson*, 476 U. S. 79. Ferrell contends that appellate counsel rendered ineffective assistance by failing, as part of her argument on direct appeal, to show that a prima facie case of racial discrimination had been available to trial counsel. Ferrell's trial attorneys testified at the motion for new trial hearing that their decision not to raise a *Batson* challenge was based on their belief that African-American jurors might identify more with the victims, who were both African-Americans. Counsel then added that they did not believe there was a good faith basis for a *Batson* motion. Because we find that trial counsel's strategy in allowing the State to strike African-American venirepersons without objecting was reasonable under the circumstances of Ferrell's case, we conclude that appellate counsel's omission did not in reasonable probability change the outcome of

the direct appeal. Furthermore, Ferrell has failed even to attempt to show that the State lacked a non-discriminatory justification for its peremptory strikes of African-American venirepersons, despite trial counsel's affirmative testimony that a *Batson* challenge did not seem justified at the time.

(4) Ferrell contends that his appellate attorney rendered ineffective assistance by failing to argue adequately that alleged "surprise testimony" was improperly admitted at trial. See OCGA § 17-7-110 (applicable at time of Ferrell's trial but now repealed). Because the record does not support Ferrell's present contention that the trial court abused its discretion by allowing him to interview the witness and then allowing the witness to testify, Ferrell cannot show prejudice stemming from appellate counsel's alleged deficient performance. See *Thrasher v. State*, 265 Ga. 401, 402-403 (3) (456 SE2d 578) (1995); *White v. State*, 253 Ga. 106, 109-110 (3) (317 SE2d 196) (1984).

(5) Ferrell's appellate lawyer did not render ineffective assistance by failing to argue the meritless claim that the trial court denied Ferrell the right to a public trial when it restricted, upon a complaint by the jury, the ingress and egress of spectators at certain times during the trial. See *Brown v. State*, 261 Ga. 66, 72 (7) (401 SE2d 492) (1991) (holding that reasonable limitations on courtroom movements do not constitute a barring of the public from proceedings). Accord *Bell v. Evatt*, 72 F3d 421, 432-433 (VII) (4th Cir. 1995).

(6) Appellate counsel argued extensively on direct appeal in two separate enumerations of error that trial counsel had rendered ineffective assistance by failing to object to allegedly improper argument concerning the victims. Ferrell has failed to demonstrate deficient performance by his appellate attorney with regard to her presentation of that claim.

(7) Appellate counsel did not argue on direct appeal that Ferrell's trial attorneys rendered ineffective assistance by failing to argue that his previous guilty pleas to four counts of forgery were involuntary for reasons related to his mental health and intellectual capacity. However, appellate counsel's omission of this claim was not deficient performance, as the evidence available as a result of trial and appellate counsel's observations of Ferrell and their consultations with mental health experts failed to provide credible support for such a claim.

(8) Ferrell's appellate lawyer did not perform deficiently in omitting a claim related to Ferrell's alleged constructive absence from his trial proceedings after an episode during the sentencing phase charge conference in which he was observed to shake, cry, and utter noises that sounded like the words "no, no." Appellate counsel raised a very similar claim on direct appeal, asserting that Ferrell was

denied his right to counsel by his allegedly impaired condition following this episode, and this Court found the claim to be without merit. The fact that such a closely related claim was actually raised demonstrates that Ferrell's appellate attorney did not perform unreasonably. Furthermore, because the evidence at the motion for new trial showed that Ferrell regained his composure and appeared to trial counsel to be "very much in contact with reality" and that the defense investigator had spoken with Ferrell and reported that he was "all right" and wished to continue, the new, related claim that appellate counsel could have successfully argued Ferrell's constructive absence is without merit.

(9) Ferrell's argument regarding the trial court's charge on reasonable doubt during the sentencing phase is addressed above and shown to be without merit. The similar argument with regard to the guilt/innocence phase charge on reasonable doubt is also meritless. Ferrell's other claims of alleged error in the sentencing phase charge are also shown above to be without merit. His appellate lawyer did not perform deficiently by failing to raise these meritless claims on direct appeal.

(10) Ferrell, even after being granted access to audiotapes of his trial, has failed to show anything about the transcription of his trial that appellate counsel could have argued that would in reasonable probability have changed the outcome of his direct appeal.

(11) Ferrell has failed to demonstrate that the prosecutor's decision to seek the death penalty against him was racially motivated or that racial discrimination infected his trial in other ways. Accordingly, his claim that appellate counsel rendered ineffective assistance in failing to make such arguments beyond those she actually raised on direct appeal must fail.

(12) On direct appeal, Ferrell's appellate attorney argued and cited relevant case law for the proposition that this Court should consider trial counsel's alleged deficiencies in light of the totality of their representation. Accordingly, we find no merit to Ferrell's claim that his appellate lawyer performed deficiently in setting out the appropriate standard for examining trial counsel's effectiveness.

## VI. Alleged Mental Retardation

Ferrell's trial counsel elected not to raise a claim of alleged mental retardation in the guilt/innocence phase of his trial, as they would have been authorized to do under OCGA § 17-7-131. However, Ferrell asserted for the first time in his habeas petition that he was, in fact, mentally retarded. The habeas court did not err by considering this new claim, because this Court, under the "miscarriage of justice" exception to the principle of procedural default, has authorized

the consideration of habeas petitioners' alleged mental retardation where the issue was not raised at trial. *Turpin v. Hill*, 269 Ga. 302, 303 (3) (b) (498 SE2d 52) (1998). The habeas court was also correct in applying the "beyond a reasonable doubt" standard to Ferrell's claim, because the guilt/innocence phase of Ferrell's trial was conducted after the effective date of OCGA § 17-7-131 (c) (3) and (j). *Turpin v. Hill*, supra at 303-304 (4). See also *Stephens v. State*, 270 Ga. 354, 357 (2) (509 SE2d 605) (1998).

Ferrell relied in his habeas petition in part upon the affidavit testimony of Jethro Toomer, Ph.D., a psychologist who found him to have a full-scale intelligence quotient of 74. Dr. Toomer explained that his and other intelligence tests generally carry "a potential error of measurement of plus or minus approximately 5 points." He further explained that "treating the I.Q. with some flexibility permits inclusion in the mental retardation category of people with I.Q.'s somewhat higher than 70 who exhibit significant deficits in adaptive behavior." Dr. Toomer found his own testing result of 74 to be "entirely consistent with the results of" 80 and 76 obtained in testing Ferrell had undergone in 1970 and 1977, when Ferrell was seven and fourteen years old. Barry Crown, Ph.D., another of Ferrell's habeas witnesses, gave affidavit testimony asserting that he agreed with Dr. Toomer's finding that Ferrell was within the range of mental retardation and further asserting that Ferrell had scored 65 on a test that "yields an IQ equivalency." A third expert, Thomas Hyde, M.D., Ph.D., gave affidavit testimony asserting that Ferrell tested as "borderline retarded" when 14 years old and that, in light of his most recent score of 74 by Dr. Toomer, Ferrell "falls within the range of mental retardation."

As noted above, Ferrell was tested as having an I.Q. of 80 and 76 prior to his eighteenth birthday. At the direction of trial counsel, Ralph Allsopp, Ph.D., tested Ferrell in 1988 and found him to have an I.Q. of 87. Dr. Allsopp concluded that neither Ferrell's past I.Q. scores nor his score of 87 showed him to be mentally retarded. Ferrell scored 93 on an intelligence test administered to him in prison, although one of Ferrell's expert witnesses contested the validity of the score. Ferrell's school records show that he was placed in the lowest non-remedial category and generally performed adequately.

"Mentally retarded" under Georgia law "means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." OCGA § 17-7-131 (a) (3). In light of the weak nature of Ferrell's habeas evidence and the credible conflicting evidence suggesting that he does not satisfy the Georgia statutory definition of "mentally retarded," we conclude that the habeas court did not err by finding that Ferrell had failed to prove beyond a

reasonable doubt that he was mentally retarded.

### VII. Execution by Electrocution

The warden urges this Court on procedural grounds to conclude that the habeas court erred in finding that execution by electrocution is cruel and unusual punishment. This portion of the judgment of the habeas court must be affirmed, as this Court's recent decision in *Dawson v. State*, 274 Ga. 327 (554 SE2d 137) (2001), declared execution by electrocution to be unconstitutional and directed that all future executions in Georgia be carried out by lethal injection in accordance with OCGA § 17-10-38, as amended.

*Judgment affirmed in part and reversed in part in Case No. S01A0840. Judgment affirmed in Case No. S01X0842. All the Justices concur.*

DECIDED OCTOBER 22, 2001.

*Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth A. Burton, Assistant Attorney General,* for appellant.

*Daniel Beck, Mark E. Olive,* for appellee.

*Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Jane E. Fahey, Rogers & Hardin, C.B. Rogers, Sutherland, Asbill & Brennan, John A. Chandler, Doffermyre, Shields, Canfield, Knowles & Devine, Ralph I. Knowles, Miles J. Alexander,* amici curiae.