S02A1515, S02X1516. HEAD v. THOMASON; and vice versa.
(578 SE2d 426)

</div>

BENHAM, Justice.

Gary Chad Thomason is a burglar who shot and killed the homeowner who came upon him while he was burglarizing the victim's home. In a bench trial, he was convicted of malice murder, burglary, and possession of a firearm by a convicted felon, and was sentenced to death. After affirmance by this Court of that conviction and sentence (*Thomason v. State*, 268 Ga. 298 (486 SE2d 861) (1997)), he filed a petition for a writ of habeas corpus. His petition was denied on all grounds save one — that he was not afforded the effective assistance of counsel during the sentencing phase of his bench trial because trial counsel failed to investigate Thomason's background

adequately and failed to present an effective case in mitigation. As a result of the determination that Thomason received ineffective assistance of counsel during the sentencing phase, the habeas court ordered a new sentencing trial. The warden appeals that ruling in Case No. S02A1515, and Thomason cross-appeals in Case No. S02X1516 the habeas court's rejection of his other claims of constitutional error.

## Case No. S02A1515

1. In granting relief, the habeas court noted that the mitigation evidence offered at trial consisted only of Thomason's profession of remorse, his lack of violent tendencies, testimony that he was easily influenced and was always with someone else when he got in trouble, and his mother's mention of his hospitalization at Charter Peachford Hospital for marijuana usage. The habeas court then chronicled the mitigation evidence trial counsel had and did not use[1] and the mitigation evidence trial counsel did not have but which was "readily obtainable through reasonable diligence."[2] The habeas court noted that trial counsel had testified at the hearing that the background information was not used or pursued because they believed it could not be used effectively without an expert and the trial court had denied their request for additional funding for a psychological evaluation. The habeas court found that counsel had not been reasonably diligent in their pursuit of expert assistance, had substantially abandoned Thomason's mitigation case, had unreasonably failed to make

---

[1] Trial counsel had, but did not use, documentation of Thomason's learning disabilities; teacher referrals for psychiatric assessment; a three-month hospitalization at Charter Peachford with diagnoses of major depressive disorder, marijuana dependence, and amphetamine abuse; the clinical psychologist who had testified at Thomason's competency hearing that his IQ was 77, a score that indicated borderline mental functioning; a professional diagnosis that Thomason's parents were enablers and that Thomason had feelings of insecurity, low self-esteem, and inferiority; a clinical social worker's opinion that Thomason's family had a strong genetic disposition to alcohol and drug abuse; and that Thomason had dropped out of school after completing the seventh grade and had a history of suicidal ideations and possible suicide attempts.

[2] At the habeas hearing, Thomason's elementary school principal, who was called as a witness in the sentencing phase only to authenticate school records, recounted an elementary school incident involving Thomason and his father's reaction to school officials' concerns about Thomason's behavior. The habeas court admitted an affidavit from Thomason's uncle, who testified during the sentencing phase that Thomason was a passive child, in which affidavit the uncle tells of Thomason's drug usage at a young age and of the rape and abuse Thomason suffered in prison. Thomason's only sibling and several elementary school teachers who were not contacted by trial counsel testified at the habeas hearing or executed affidavits about their personal knowledge of Thomason and his circumstances. Medical records other than the Charter Peachford hospitalization and school assessments were not obtained, even though one indicated Thomason had suffered a febrile convulsion as an infant, and a treating physician stated in an affidavit that he recalled treating Thomason 26 years earlier because "he seemed particularly slow" and the physician feared he was mentally retarded.

use of considerable information in counsel's possession, made no effort to secure other information readily available, and made no effort to pursue alternative possibilities for securing assistance from the psychiatrist who examined Thomason. Based on those findings, the habeas court found counsel's performance deficient, and further concluded that there was a reasonable probability that the death penalty would not have been imposed if counsel had effectively utilized the available information and resources.

A habeas court's determination on a claim of ineffective assistance of counsel is to be affirmed unless the reviewing court concludes the habeas court's factual findings are clearly erroneous or are legally insufficient to show ineffective assistance of counsel. See *Head v. Carr*, 273 Ga. 613, 616 (544 SE2d 409) (2001). Review of the record in this case persuades us that there is evidence to support the trial court's findings and that they are not, therefore, clearly erroneous. It remains our task to consider whether those facts support the legal conclusion that counsel were ineffective and that the ineffectiveness prejudiced Thomason. Id.

Mitigating evidence, *"anything* that might persuade the jury to impose a sentence less than death," (*Head v. Ferrell*, 274 Ga. 399, 405 (554 SE2d 155) (2001)), is critical in the sentencing phase of a death penalty trial since "the [jury] may withhold [imposition of] the death penalty for any reason, or without any reason." *Smith v. Francis*, 253 Ga. 782, 787 (325 SE2d 362) (1985). We have recognized the importance of mitigating evidence by holding that the permissible scope of such evidence is wide (*Barnes v. State*, 269 Ga. 345 (27) (496 SE2d 674) (1998)), and by noting that evidentiary rules are relaxed during the sentencing phase. *Smith v. State*, 270 Ga. 240 (12) (510 SE2d 1) (1998). The test for finding deficient performance of an attorney who is claimed to have been ineffective with regard to mitigating evidence is whether a reasonable lawyer would have acted the way defense counsel did. *Head v. Carr*, supra, 273 Ga. at 616. An attorney's failure to have a mental health expert review medical records for mitigating evidence can be unreasonable conduct. *Turpin v. Lipham*, 270 Ga. 208, 216 (510 SE2d 32) (1999). In the case at bar, defense counsel knew of two mental health experts who had spent time with Thomason — one a clinical psychologist who testified at the defendant's competency hearing that the defendant has an IQ of 77, and the other a psychiatrist who interviewed the defendant, who told defense counsel he saw in the defendant indications of intellectual impairment, low self-esteem, and depression, to whom defense counsel offered the defendant's school, medical, and institutional records as well as information about the crime for a forensic evaluation, but to whom the attorney never gave the offered material. In addition to failing to follow through on his promise to give the requested mate-

rial to the psychiatrist, defense counsel called neither expert to present evidence in mitigation — and then presented none of the mitigating evidence the defense had amassed because counsel did not know how to do it without an expert.

Trial counsel recognized the need for expert testimony, yet failed to have the expert who had already conducted an interview with the defendant execute an affidavit for use in securing additional funding for the expert. Instead, trial counsel asked the expert for a letter breaking down the cost of a full forensic psychiatric evaluation of Thomason. The expert's letter apparently served as the basis for trial counsel's request for an additional $25,000 for mental health expert assistance. When trial counsel's efforts to obtain the additional funding were rejected by the trial court, trial counsel never contacted the expert again. In an affidavit submitted at the habeas hearing and relied on by the habeas court, the expert stated he would have worked with counsel without further funding or for a figure significantly less than that set forth in his letter had that been necessary. The expert noted he could have reduced the cost by utilizing defense team members to conduct interviews rather than conducting them himself and, had he had the materials provided to him by habeas counsel, he would have been able to assist in providing evidence in mitigation. However, trial counsel never contacted the expert again once the request for additional funding was denied. We conclude, given the importance of mitigating evidence in death penalty cases, that an attorney has not acted reasonably when he fails to call mental health experts he knows have mitigating evidence and explains his failure to present lay mitigating evidence by asserting that he had no experts to call.

It is likely that trial counsel's guard was down at the sentencing phase due to counsel's belief that the trial judge who presided over the bench trial would not impose a death sentence.[3] While we agree with the habeas court's determination that trial counsel's advice to Thomason to waive his right to a jury trial based on counsel's erroneous assumptions about the trial judge did not alone amount to ineffective assistance of counsel, we conclude that counsel's erroneous

---

[3] On advice of counsel, Thomason waived his right to a jury trial. Counsel believed the case was not a death penalty case and that a judge would see that more clearly than a jury, especially in light of the constant courtroom presence of the victim's family, who were influential members of the community. Counsel also believed (albeit wrongly) that the judge before whom the case was tried had never sought the death penalty while serving as district attorney; that the judge disliked the current district attorney because the latter had opposed and defeated the judge in an election for district attorney; and that the judge believed the case called for life imprisonment since the judge had expressed displeasure with the district attorney for deferring to the victim's family while negotiating a plea agreement for life imprisonment.

assumptions and the concomitant feeling of assuredness caused counsel to be less diligent in preparing for the sentencing phase than they would have had they believed they were dealing with a factfinder who might impose the death penalty.

These circumstances, coupled with counsel's failure to make use of the mitigating evidence and the experts they had, persuade us that the habeas court was correct in its conclusion that there is a reasonable probability that the presentation of the mitigating evidence presented at the habeas hearing would have changed the outcome of the sentencing phase of Thomason's trial. See *Head v. Carr*, supra, 273 Ga. at 626. Accordingly, we affirm the grant of a new sentencing trial.

### *Case No. S02X1516*

2. In any case in which doubt arises concerning this Court's jurisdiction, we have a duty to address that question. *Powell v. City of Snellville*, 275 Ga. 207 (1) (563 SE2d 860) (2002). In the present case, the dissent asserts that the cross-appeal should be dismissed because Thomason did not file his notice of cross-appeal within 15 days of the service on him of the notice of appeal as is required by OCGA § 5-6-38. In fact, Thomason filed his notice of cross-appeal 17 days after service by mail of the warden's notice of appeal.

The dissent is correct in noting that OCGA § 9-14-52 (a) provides that appeals in habeas corpus cases shall be governed by the Appellate Practice Act, OCGA § 5-6-30 et seq. However, that provision only means that appeals in habeas corpus cases, once begun, are to be handled in the same way as other civil appeals. The Appellate Practice Act does not provide for every single act involved in an appeal. Because there is no provision in the Appellate Practice Act for computing time limits, the Court of Appeals has at least twice found it necessary to supplement the provisions of the Appellate Practice Act by reference to OCGA § 9-11-6: *Southern Guar. Ins. Co. of Ga. v. Goddard*, 190 Ga. App. 97, 98 (378 SE2d 130) (1989) (applying OCGA § 9-11-6 (a) to the computation of the time for filing a notice of appeal); *Nat. Consultants v. Burt*, 186 Ga. App. 27 (1) (366 SE2d 344) (1988) (applying the provision in OCGA § 9-11-6 (e) for three extra days when a notice is served by mail to the computation of time for filing a cross-appeal). Application of those provisions to situations not provided for in the Appellate Practice Act is consistent with the General Assembly's command in OCGA § 5-6-30 that the Appellate Practice Act "shall be liberally construed so as to bring about a decision on the merits of every case appealed and to avoid dismissal of any case. . . ." We believe the approach of the Court of Appeals in the cases cited above is appropriate for the present case and hold that

the notice of cross-appeal was timely because it was served within the fifteen-day period provided by OCGA § 5-6-38 (a) plus the three-day extension provided for in OCGA § 9-11-6 (e).

3. To the extent that Thomason's cross-appeal arguments address matters relevant solely to his death sentence, they are moot in light of our affirmance in the main appeal. Accordingly, those arguments will not be discussed here.

4. Thomason contends his trial counsel rendered ineffective assistance by advising him to waive a jury trial. The habeas court found as fact that trial counsel had a number of strategic reasons to favor a bench trial, including a belief that a judge would think Thomason's crimes less worthy of death than a jury, a perception that the trial judge personally disliked the district attorney for various reasons, a perception that the trial judge was annoyed with the district attorney's conduct during plea discussions, and a fear of the impact the victim's family in the courtroom would have on a jury. The habeas court also found as fact, however, that one of counsel's reasons for preferring a bench trial, a belief the trial judge had never sought the death penalty during his former tenure as a district attorney, was incorrect. The habeas court, after finding these facts, did not decide as a matter of law whether counsel had performed unreasonably in recommending Thomason waive his right to a jury trial, but proceeded directly to the second prong of the test set out in *Strickland v. Washington*, 466 U. S. 668 (III) (104 SC 2052, 80 LE2d 674) (1984), and found no prejudice. However, pursuant to the rule that this Court must accept the habeas court's findings of fact unless they are clearly erroneous, but applies those facts to the law de novo (*Head v. Carr*, supra, 273 Ga. at 616), we conclude as a matter of law that counsel's advice to Thomason to waive a jury trial was not deficient performance, even in light of their one mistaken reason for giving that advice. Whether to waive a jury trial is a strategic decision to be made by an accused after consultation with counsel. *Van Alstine v. State*, 263 Ga. 1, 2 (426 SE2d 360) (1993). Strategic decisions of counsel (in this case, whether to advise Thomason to waive a jury trial) are to be judged by "whether the decision was . . . reasonable on the basis of the facts of the particular case, viewed as of the time of counsel's conduct. [Cits.]" *Battles v. Chapman*, 269 Ga. 702, 704 (1) (a) (506 SE2d 838) (1998). Applying that standard to the facts found by the habeas court, we conclude the other reasons for advising Thomason to waive jury trial constituted reasonable bases for that strategic decision. Accordingly, we find no fault in the habeas court's holding that giving that advice did not constitute ineffective assistance of counsel.

5. The habeas court rejected Thomason's contention that counsel were ineffective in their conduct of the plea bargain process. That

court's findings accurately reflect the fact that, despite Thomason's inconsistent reporting of the facts to counsel and his unwillingness to accept a sentence of life without parole, counsel actively pursued opportunities to seek a plea agreement with the State. Counsel discussed the sentencing and plea possibilities with Thomason and diligently pursued information that would assist Thomason in obtaining an acceptable plea agreement. In light of counsel's efforts, we find no merit in Thomason's contention that his trial counsel rendered deficient performance in assisting and advising him in the plea bargaining process. *Strickland v. Washington*, supra, 466 U. S. at 687; *Smith v. Francis*, supra, 253 Ga. at 783-784 (1).

6. Thomason has failed to demonstrate that his trial counsel rendered deficient performance in seeking funds for a crime scene reconstruction expert, and, furthermore, even assuming counsel performed deficiently, Thomason has failed to show prejudice relevant to his convictions, as the testimony presented by Thomason's investigator in the habeas court fails to cast doubt on Thomason's guilt. Id.

7. Thomason argues that his written and oral waiver of a jury trial was not knowing, intelligent, and voluntary. As an independent claim, this argument is barred by procedural default, because it was not raised on direct appeal. *Head v. Ferrell*, 274 Ga. at 401-402 (III). However, Thomason also argues that his counsel rendered ineffective assistance in failing to raise the claim on direct appeal, which, if proven, would serve both as cause to set aside the procedural bar and as an independent claim. Id. Nevertheless, our review of the record fails to support Thomason's contention that the trial court acted improperly or misleadingly with regard to plea discussions or the waiver of a jury trial, that the decision to recommend the waiver was made without proper consultation with Thomason, or that Thomason was unable to understand the advice of his counsel and the warnings of the trial court. See *Watson v. State*, 274 Ga. 689, 690-691 (2) (558 SE2d 704) (2002) ("A trial court should ask the defendant sufficient questions on the record so that the court can ensure the defendant's waiver is knowing, voluntary, and intelligent."); *Grant v. State*, 246 Ga. App. 376, 377 (3) (540 SE2d 634) (2000) (discussing appropriate role of trial court during the parties' plea discussions and in accepting a waiver of jury trial). Because Thomason's underlying claim that his waiver was not knowing, intelligent, and voluntary lacks merit, it must also follow that Thomason's appellate counsel did not render ineffective assistance in not raising the claim on direct appeal and, in turn, that there is no cause to set aside the procedural bar to the underlying claim. *Battles v. Chapman*, supra, 269 Ga. at 703-705 (setting forth standard for examining appellate counsel's performance).

8. This Court found on direct appeal that the evidence was suffi-

cient to prove beyond a reasonable doubt that Thomason was guilty of malice murder. *Thomason v. State*, 268 Ga. 298 (1) (486 SE2d 861) (1997). The habeas court properly found this Court's assessment of the trial evidence to be res judicata. *Head v. Ferrell*, 274 Ga. at 401 (II). The habeas court also did not err in concluding that Thomason had not shown new evidence capable of supporting his claim of a miscarriage of justice. See OCGA § 9-14-48 (d); *Valenzuela v. Newsome*, 253 Ga. 793, 796 (4) (325 SE2d 370) (1985).

9. The habeas court correctly found Thomason's claim of alleged evidence suppression by the State was barred by procedural default because it was not raised on direct appeal. *Head v. Ferrell*, 274 Ga. at 401-402 (III). We find the habeas court did not err in not finding sufficient cause and prejudice to set aside the procedural bar to this claim, particularly with respect to the claim's relation to Thomason's convictions. Id. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

10. The habeas court properly found Thomason's claim regarding the Unified Appeal Procedure was barred by procedural default and no cause or prejudice had been shown to set aside that bar. *Head v. Ferrell*, 274 Ga. at 401-402 (III). See *Jackson v. State*, 270 Ga. 494, 498-499 (10) (512 SE2d 241) (1999).

11. The habeas court properly found Thomason's claim regarding cumulative error, which is not recognized in Georgia courts, was barred by procedural default and no cause or prejudice had been shown to overcome that bar. *Head v. Ferrell*, 274 Ga. at 401-402 (III). See *Laney v. State*, 271 Ga. 194 (11) (515 SE2d 610) (1999).

12. The habeas court correctly found Thomason's claim he was tried while incompetent was barred by procedural default and no cause or prejudice had been shown to overcome that bar. *Head v. Ferrell*, 274 Ga. at 401-402 (III).

13. The habeas court correctly found Thomason's claim regarding his being called as a witness by the State in his competency trial was barred by procedural default. Id. The habeas court did not err in not finding Thomason had demonstrated prejudice, either with respect to the cause and prejudice test applicable to claims barred by procedural default or with respect to Thomason's related ineffective assistance of trial counsel claim. Id. See *Strickland v. Washington*, supra, 466 U. S. at 687 (III). Accordingly, we need not address the underlying merits of Thomason's claim he was improperly called as a witness at his competency trial.

14. The habeas court correctly found Thomason's unspecific claim regarding his alleged absence during portions of his trial was barred by procedural default and Thomason had failed to show cause or prejudice sufficient to set aside that bar. *Head v. Ferrell*, supra, 274 Ga. at 401-402 (III).

15. The habeas court correctly found Thomason's claim he was denied sufficient assistance from a mental health expert is barred as res judicata because that same claim was rejected by this Court on direct appeal. *Head v. Ferrell*, supra, 274 Ga. at 401 (II). See *Thomason v. State*, supra, 268 Ga. at 310-311 (7).

16. The trial court correctly found Thomason's claim of alleged misconduct by his competency trial jurors was barred by procedural default and Thomason had failed to show cause and prejudice sufficient to set aside that bar. *Head v. Ferrell*, 274 Ga. at 401-402 (III).

*Judgment affirmed in Case No. S02A1515. All the Justices concur, except Hunstein, Carley and Thompson, JJ., who dissent. Judgment affirmed in Case No. S02X1516. All the Justices concur, except Sears, P. J., and Thompson, J., who dissent.*

CARLEY, Justice, concurring in part and dissenting in part.

I concur in Divisions 2-16 of the majority opinion and to the affirmance of the judgment in Case No. S02X1516. I dissent to Division 1 of the majority opinion and to the affirmance of the judgment in Case No. S02A1515 for the reasons set forth in Division 1 of Justice Thompson's dissent.

THOMPSON, Justice, dissenting.

In my view, the habeas corpus court erred in determining that Thomason's counsel rendered ineffective assistance in the sentencing phase. Moreover, although I would agree that the cross-appeal lacks merit, I would hold that this Court is without jurisdiction to entertain it. Accordingly, I respectfully dissent.

1. The evidence at trial showed that Jerry Self arrived at his home on August 21, 1992, and discovered an unfamiliar automobile parked in his driveway. Mr. Self parked his truck behind the unfamiliar automobile, telephoned the police, and sat waiting. The evidence strongly suggested that Thomason, who had entered Mr. Self's home by breaking a front window, took Mr. Self's .357 caliber handgun from inside the home, exited through the back basement door to avoid Mr. Self's attention, climbed over a fence, came around the home through a wooded area, opened the passenger door of Mr. Self's truck, and fired repeatedly at him. Thomason then pulled Mr. Self's body out of the truck and onto the driveway, drove the truck to the front yard, and hastily fled in the automobile in which he had arrived. Two officers approaching Mr. Self's home carefully observed Thomason fleeing alone in the automobile and radioed a description of both the automobile and Thomason. Thomason was captured soon thereafter in the suspect automobile with Mr. Self's blood on his clothing in a location consistent with his having sat in the driver's seat of Mr. Self's truck. Mr. Self's engraved lighter, as well as jewelry

from another burglary committed earlier that same day, were discovered in Thomason's pockets. The automobile was leaking transmission fluid, which explained the puddle of transmission fluid found at the scenes of both burglaries. The automobile also had tires with unusual wear patterns that corresponded to marks on Mr. Self's driveway, and it contained specially-folded two dollar bills similar to those Mr. Self had collected.

The habeas court vacated Thomason's death sentence on the ground that Thomason's trial counsel rendered ineffective assistance in preparing and presenting mitigating evidence in the sentencing phase of the trial. In that phase, the State put up evidence of Thomason's extensive criminal history. Testimony from Thomason's witnesses showed that Thomason had been treated at Charter Peachford Hospital, suggested that he was a non-violent and easily-led person, and highlighted his family's sacrifices on his behalf and their hope that he not be sentenced to death. Thomason himself testified about his own remorse.

An ineffective assistance claim must demonstrate both that counsel performed deficiently under constitutional standards and that the deficiency prejudiced the defendant to the extent that it in reasonable probability changed the outcome of the criminal proceeding. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U. S. at 690. Furthermore, counsel's decisions and strategy choices must be evaluated in reference only to the circumstances at the time of trial and trial preparation. Id. at 689-690.

Whether counsel rendered ineffective assistance is a mixed question of law and fact. On appeal, this Court accepts the lower court's findings of fact unless they are clearly erroneous; but it must independently apply those facts to the law. *Strickland*, 466 U. S. at 698; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993). Accepting the lower court's findings of fact, and applying those facts to the law, leads me to conclude that trial counsel did not render ineffective assistance.

In the years leading up to Thomason's trial, trial counsel surmised that mental health issues were potentially relevant both to a competency trial and to the sentencing phase of a death penalty trial. The trial court granted Thomason's request for a court-funded examination of Thomason by a psychologist named Dr. Samuel Perri. Trial counsel also successfully moved the trial court for funding for assistant counsel and for 50 hours of private investigation, which investigation was to include "all matters which may have a bearing

on mitigating factors." Trial counsel then successfully moved the trial court ex parte for an additional $3,500 for an initial psychiatric examination of Thomason to be conducted prior to the competency trial by James Cheatham, M.D.

Trial counsel forwarded Dr. Cheatham a check for $3,500, a copy of the indictment, and a copy of Dr. Perri's report. After Dr. Cheatham's initial examination of Thomason, trial counsel made an ex parte request for additional funding of $25,000. Trial counsel explained to the trial court that he had met with Dr. Cheatham at trial counsel's home to discuss the case the evening after Dr. Cheatham's initial examination of Thomason. In that regard, trial counsel also provided the trial court with a copy of a letter from Dr. Cheatham outlining additional work Dr. Cheatham proposed for a minimum fee of $25,000.

The trial court withheld a decision on the request and provided trial counsel with orders with which to obtain Thomason's school records, incarceration records, and Charter Peachford Hospital records. Trial counsel provided the trial court with a copy of the records, and, in a subsequent ex parte hearing, trial counsel argued that the records raised sufficient concerns to warrant the granting of $25,000 for Dr. Cheatham's proposed work or, alternatively, for the granting of one-third of that amount for preliminary work and the opportunity to renew the motion for additional funds. The trial court denied both alternative requests, and this Court found no error on direct appeal, holding that the records before the trial court did not demonstrate that additional mental health evaluation was "critical to Thomason's defense" or that denial of such additional evaluation had rendered Thomason's trial "fundamentally unfair." *Thomason v. State*, 268 Ga. 298, 311 (7) (486 SE2d 861) (1997).

Much of what the habeas court found lacking in Thomason's trial counsel's performance in the sentencing phase regards Thomason's school records and the records from his three-month period of in-patient psychiatric treatment at Charter Peachford Hospital. However, these are the same records that were before the trial court during trial counsel's ex parte request for additional evaluation by, and at the direction of, Dr. Cheatham and the same records that were before this Court on direct appeal.

Thomason's school records revealed that Thomason suffered from dyslexia, performed poorly, repeated grades several times, and had poor self-esteem. However, the records also included a great deal of information that would not have been mitigating. Thomason is described in the school records as having been hot tempered, confident to a fault, resentful toward authority, unwilling to accept correction, lacking in impulse control, lacking in anger control, defiant, abusive to others, lazy, lacking in respect of other people's property,

and having "a thick candy shell." The school records also included intelligence quotient scores of 90, 94, 100, 109, and 119, which placed Thomason somewhere in the range of lower-average to average intelligence.

The Charter Peachford Hospital records indicated that Thomason's father had required Thomason to submit to treatment as a precondition for Thomason's being bailed out of jail, where Thomason had landed after disappearing from home for days and then being arrested for stealing and forging checks. Thomason received a final diagnosis of major depressive disorder, cannabis dependence, and amphetamine abuse. The records of his treatment included arguably mitigating references to his low self-esteem, his education failures, the fact that his parents enabled his drug use and rebellion by being overly permissive and somewhat in denial, the fact that he had a family history of substance abuse suggestive of a genetic predisposition to addiction, the fact that he had been introduced to drugs as early as eight years of age, and the fact that he cooperated at least some of the time in his own treatment. The records also showed, however, that Thomason was highly manipulative, was deceptive, had anti-social tendencies, was resistant to authority figures, refused at times to study or to participate in his treatment, lied to avoid studying, cheated on his GED work, had stolen from his parents in the past, likely stole an audiotape from the hospital, had an intelligence quotient of 94, and thought that he had a good relationship with his parents and that their lack of discipline was because they "love[d him] too much."

Thomason's lead trial counsel testified before the habeas court that he considered using Thomason's records at trial without the assistance of an expert but that he "did not think that that was the main issue," that portions of the records were helpful and other portions were damaging, and that he "didn't know how to use [the records] properly" without expert testimony. Thomason's assistant counsel testified by deposition in the habeas proceeding that he had discussed the records with lead counsel, that they found the records to be "valuable . . . [b]ut not standing alone[,]" and that they felt they should not use the records at trial without an expert "to interpret them and to explain them and provide some sort of background and an understanding of why these things are relevant to finding a reason not to put somebody to death."

Given the mixture of aggravating and mitigating information in the records and given counsel's consideration of strategy prior to making a decision not to use them, this Court would not be authorized to find that counsel had rendered ineffective assistance in foregoing use of the records at trial unless other circumstances shed an entirely different light on the matter. The habeas court addressed

one such alleged circumstance, namely, that trial counsel allegedly rendered ineffective assistance in seeking additional funds for Dr. Cheatham's services.

Trial counsel's and Dr. Cheatham's testimonies are somewhat at odds. Dr. Cheatham gave habeas affidavit testimony claiming that he had not fully billed against the initial funds he had been provided prior to trial and that he "perhaps" would have been willing to do additional work for a reduced, or even no, fee. Trial counsel testified before the habeas court that the initial fee was for an initial examination, that Dr. Cheatham required additional money before reviewing Thomason's records, and that Dr. Cheatham never offered to work for free. The habeas court's finding of fact resolving conflict between Dr. Cheatham's habeas affidavit testimony (wherein he speculated as to what he "perhaps" would have been willing to do), and the different view suggested by the trial record and the habeas testimony of trial counsel is highly suspect. However, that finding does not demonstrate trial counsel's constitutionally deficient performance even if assumed correct. The record of ex parte hearings, briefs in the trial court, and letters to and from trial counsel and Dr. Cheatham all demonstrate the reasonableness of trial counsel's belief that all of the funds already paid to Dr. Cheatham had been for the initial competency evaluation that he had already performed and that no other work would be possible without additional funds. The fact, if assumed true, that Dr. Cheatham "perhaps" would have done, or even *would* have done, some additional work without further funds does not demonstrate trial counsel's constitutionally deficient performance as judged in reference to the circumstances confronting them at the time.

Again, this Court must consider the effectiveness of trial counsel's assistance to Thomason within the context of circumstances at the time. The portions of Dr. Cheatham's habeas testimony which address Thomason's records and the background information available to trial counsel at the time of Thomason's trial are not so compelling that there in reasonable probability would have been a different decision by the trial court regarding additional funds or a different outcome at trial. Those portions of Dr. Cheatham's habeas testimony are, in fact, little different from the arguments that trial counsel himself made to the trial court from the records and that the trial court did not find sufficiently critical to warrant additional court funds. Thus, I would find that Thomason failed to demonstrate deficient performance or prejudice with regard to the manner in which his trial counsel sought additional funds for expert mental health assistance.

The habeas court also addressed a number of other pieces of evidence that the habeas court found mitigating and that were

addressed in Dr. Cheatham's habeas testimony. In addition to noting references in Thomason's school and Charter Peachford Hospital records about Thomason's learning disability, psychological and/or behavioral problems, failures in school, and drug use and addiction, the habeas court also noted new affidavit testimony presented for the first time in the habeas court. However, all of this new testimony was either unavailable to trial counsel after their reasonable investigation of Thomason's case or was not sufficiently compelling to authorize a finding that pretrial and trial use of such testimony in reasonable probability would have changed the outcome of the sentencing phase of Thomason's trial.

Trial counsel were not without a sound strategy for arguing mitigating circumstances in the sentencing phase of Thomason's trial. Lead trial counsel described his strategy as follows before the habeas court: "My strategy was not a guilt or innocence strategy, it was a minimization of damage strategy. And, again, it was designed to prevent the death penalty." At the guilt/innocence phase, trial counsel had emphasized the alleged lack of evidence indicating that Thomason had been the triggerman and the possibility that there had been an accomplice. In the sentencing phase, trial counsel continued and refined this theme, with witnesses indicating that Thomason was a non-violent and sensitive person, was a follower, was led astray by others into drugs and crime, and had never acted alone in his previous crimes. Thomason's witnesses also pleaded with the trial court for mercy. Thomason himself became tearful in the courtroom and gave testimony about his own remorse. Counsel then argued that Thomason's case was less aggravated than other cases the trial court would have seen, emphasized Thomason's emotional response in the courtroom, emphasized the "unrehearsed" nature of Thomason's witnesses, emphasized that the evidence put forward by the State regarding Thomason's past crimes showed that he had always acted with an accomplice, and asserted that "this is not a death penalty case." I believe that this sentencing phase strategy was reasonably chosen by trial counsel after their reasonable efforts to investigate other, alternative strategies.

In conclusion, the record in this case, as the discussion above illustrates, does not support Thomason's claim of ineffective assistance regarding trial counsel's preparing and presenting mitigating evidence in the sentencing phase. Counsel gathered potential evidence in a reasonable manner and presented selective portions of that evidence in a manner which was consistent with their chosen strategy.

2. The timely filing of a notice of appeal or notice of cross-appeal is necessary to confer jurisdiction upon this Court. See *Fullwood v. Sivley*, 271 Ga. 248 (517 SE2d 511) (1999). Failure to comply with the

statutorily-imposed time requirements for appeal results in dismissal where an unsuccessful habeas petitioner has been advised of the proper appellate procedure by the habeas court or where, as here, the petitioner is represented by counsel. See *Hicks v. Scott*, 273 Ga. 358-359 (541 SE2d 27) (2001) (excusing the untimely filing of an application for certificate of probable cause to appeal by a pro se appellant who was not advised of appellate procedure).

The Warden filed a timely notice of appeal on April 24, 2002, and he served a copy of the notice of appeal on Thomason by placing the copy in the mail the previous day, April 23, 2002. Thomason's notice of cross-appeal was filed on May 10, 2002, which was 16 days after the Warden's notice of appeal was filed and which, more importantly, was 17 days after the copy of the Warden's notice of appeal was served by mail.

An "appellee may institute cross appeal by filing notice thereof within 15 days from service of the notice of appeal by the appellant." OCGA § 5-6-38. Service by mail of a notice of appeal is "deemed to be perfected as of the day deposited in the mail." OCGA § 5-6-32.

Because Thomason's notice of cross-appeal was filed 17 days after the date reflected in the Warden's certificate of service of the notice of appeal, it was not timely filed, and the cross-appeal should be dismissed. See *Southern Discount Co. v. Ector*, 152 Ga. App. 244, 247 (3) (262 SE2d 457) (1979), rev'd on other grounds, 246 Ga. 30 (268 SE2d 621) (1980).

Although OCGA § 9-11-6 (e) adds three days to a prescribed period when a party is required to act in a civil action and notice is served by mail, that Code section has no application with regard to the time within which a notice of cross-appeal must be filed. As noted above, the Appellate Practice Act speaks to the time period within which a cross-appeal must be filed. The Act requires a notice of cross-appeal to be filed within 15 days of the service of the notice of appeal, OCGA § 5-6-38, and it specifies that a notice of appeal is served when it is deposited in the mail. OCGA § 5-6-32. Thus, even if the Civil Practice Act were somehow grafted to the Appellate Practice Act, OCGA § 9-11-6 (e) would not control this cross-appeal.

The majority's reliance upon *Southern Guar. Ins. Co. of Ga. v. Goddard*, 190 Ga. App. 97, 98 (1) (378 SE2d 130) (1989), and *Nat. Consultants v. Burt*, 186 Ga. App. 27, 28 (1) (366 SE2d 344) (1988), is misplaced. *Southern Guaranty* referenced OCGA § 9-11-6 (a) and did not concern the time for filing a cross-appeal. *National Consultants* did not hold that OCGA § 9-11-6 (e) applies to a cross-appeal. In that case, the Court of Appeals dismissed the cross-appeal, pointing out that it was untimely even if OCGA § 9-11-6 (e) were applied in favor of the cross-appellant.

I am authorized to state that Justice Sears joins in Division 2 of this dissent.

DECIDED MARCH 24, 2003 —
RECONSIDERATION DENIED APRIL 10, 2003.

*Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Patricia A. Burton, Mitchell P. Watkins, Assistant Attorneys General,* for appellant.
*Thomas H. Dunn, Feinberg & Kamholtz, Matthew Feinberg, Matthew Kamholtz,* for appellee.